UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    :
DANIEL VITALE, Plaintiff                            :
                                                    :     C.A. No. _____
v.                                                  :
                                                    :
NPS, LLC, Defendant                                 :
_____

### **COMPLAINT**

NOW COMES the Plaintiff, Daniel Vitale ("Mr. Vitale"), and complains against the

Defendant, NPS, LLC ("NPS" or "Defendant"), as follows:

### **Introduction**

This action arises from Defendant's degradation and damage to a Tom Brady

autographed American Flag flown at Foxboro Stadium on December 22, 2001 (the "Flag").

The Flag was a priceless piece of sports memorabilia and historical artifact of the storied

New England Patriots dynasty signed by Tom Brady, the winningest quarterback in the

history of the National Football League.   After NPS assured Mr. Vitale that it would be

"curated" and cared for to the highest standard, Mr. Vitale agree to loan the Flag to NPS for

display in a premier case at the Patriot's Hall of Fame.   NPS falsely represented its ability to

care for and protect this invaluable piece of Patriots' history that Mr. Vitale entrusted to their

care.  During the time NPS possessed the Flag, from June 24, 2021 to February 1, 2022, it

allowed the Flag to be exposed to UV light or direct sunlight, significantly fading the Tom

Brady signature.  The degradation NPS caused to the Flag is extensive and irreparable.

NPS' fraudulent, deceptive and grossly negligent conduct, before, during and following the

damage to the Flag, amounts to unfair and deceptive business practices in violation of

1

M.G.L. c. 93A.   Mr. Vitale seeks damages for the decreased value to the Flag as well as treble damages, attorneys' fees and costs.

## The Parties

1.      Daniel Vitale is an individual who resides at 65 Brighton Drive, Hampstead, New Hampshire.

2.      NPS, LLC is a Delaware corporation with a principal place of business sat One Patriot Place, Foxborough, Massachusetts.

## Jurisdiction and Venue

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue for this action is proper in this Court pursuant 28 U.S.C. 1391 because the Defendant has a principal place of business in this judicial district and is subject to this Court's personal jurisdiction.

## Facts Common to All Counts

### The Flag

5.      The Flag is a one-of-a-kind artifact from the storied New England Patriots.

6.      The Flag, which is in pristine condition, has a Commemorative Final Season at Foxboro Stadium Patch sewn onto the border with embroidered New England Patriots vs Miami Dolphins helmets. Embroidered in blue is the date "December 22, 2001 -  3RD Quarter - Final Season."

7.      The Flag bears the signature of Tom Brady on the border to the left of the Commemorative Patch.

8.      The Flag has a Certificate of Authenticity and a Tri-Star Authentic hologram, serial #3141814, located in between the signature and the patch, which validates the Tom Brady signature.

9.      Mr. Vitale acquired the Flag in early 2020 as an investment.

10.     From the time Mr. Vitale acquired the Flag until the day he loaned it to NPS, Mr. Vitale kept the Flag in its original box.

11.     At the time of acquisition, and through the time that Mr. Vitale loaned the Flag to NPS, the Tom Brady signature on the Flag was pristine and in near perfect condition.

12.     In 2021, Mr. Vitale reached out to the NFL Hall of Fame about their interest in displaying the Flag.

13.     At that time, the NFL Hall of Fame did not have exhibit space for the Flag but said that they would want to display it when both Tom Brady and Bill Belichick retired and suggested that Mr. Vitale contact the New England Patriots Hall of Fame in the interim.

14.     Subsequently, in May of 2021, Mr. Vitale contacted Kurt Evans, whom Mr. Vitale understood to be the Patriots Hall of Fame curator.

15.     NPS is the entity that owns and/or operates the Patriots Hall of Fame.

16.     NPS holds itself out to the public as a "museum" on www.patriotshalloffame.com and Mr. Evans as its "curator."

17.     Mr. Evans, after speaking with his superior, indicated that NPS wanted to take the Flag on loan for display in the premier case next to the Tom Brady stolen Super Bowl jersey.

18.     Mr. Vitale emphasized to Mr. Evans in their telephone calls and subsequent emails between May 12, 2021 and May 19, 2021 that the Flag was a very special item and that the utmost care needed to be taken if he were to allow NPS to put it on display.

3

19.     Between May 12, 2021 and May 19, 2021, Mr. Evans assured Mr. Vitale that NPS was a "museum" and that it would be "curated to the highest standard."

20.     Between May 12, 2021 and May 19, 2021, Mr. Evans further assured Mr. Vitale that he would have access to the Flag when requested and that NPS "would do whatever was needed to preserve it."

**The NPS Loan Agreement**

21.     On May 19, 2021, Mr. Evans sent Mr. Vitale NPS' Standard Loan Agreement (the "Agreement") and indicated that it was the agreement NPS used for all items on loan.

22.     Paragraph 1 to Schedule 1 of the Agreement states that NPS would exhibit the Flag "using accepted professional library and museum techniques and standards."

23.     Paragraph 3 to Schedule 1 of the Agreement contains a "hold harmless" provision.

24.     Paragraph 20 of the Agreement puts the onus on NPS to determine if an item is too fragile for display.

25.     Paragraph 18 of the Schedule to the Agreement 18 required NPS to notify Mr. Vitale of any harm or loss to the Flag as soon as reasonably practicable.

**Mr. Vitale Loans NPS the Flag After NPS' Assurances and Representations**

26.     On June 24, 2021, Mr. Vitale and a family friend traveled to NPS for the purpose of transferring possession of the Flag to NPS for display.

27.     Upon arrival, Mr. Evans again reassured Mr. Vitale that they were a "museum" and that they would care for the Flag properly.

28.     Based on the repeated assurances that NPS was a "museum" and that they would "curate" and care for the Flag, Mr. Vitale signed two copies of the Agreement.

29.     Based on NPS' representations that it was a "museum" and that it would "curate" and protect the Flag, as well as NPS' representations in the first paragraph of the

Agreement, Mr. Vitale opted not to insist on insurance and agreed to the "hold harmless" language in the Agreement.

30.     Had NPS been truthful and acknowledged their lack of knowledge and ability in the field of professional library and museum techniques and standards, Mr. Vitale would never have loaned the Flag, and if he did, he certainly would have insisted on insurance to protect its value while in NPS' possession.

31.     NPS' material and deliberate misrepresentations deprived Mr. Vitale of an informed decision on these issues.

32.     Mr. Vitale took video of the Flag and accompanying documentation as he transferred possession of the Flag to NPS.

**NPS Displays the Flag**

33.     On June 28, 2021, Mr. Evans sent Mr. Vitale an email attaching photos of the Flag on display in the premier case at NPS.

34.     Mr. Vitale responded that the Flag was "absolutely perfect for that [display] case!!!"

35.     Unfortunately, as Mr. Vitale and NPS found out, the case was far from perfect for the Flag.

36.     As Mr. Vitale would later learn, neither the lighting at NPS nor the glass NPS used for the case displaying the Flag were designed to protect autographed sports memorabilia.

37.     Mr. Vitale further learned that there was a significant gap in the glass directly in front of the Flag through which unfiltered light and heat could pass.

**NPS Damages the Flag and hides the Damage from Mr. Vitale**

38.     On November 6, 2021, Mr. Vitale emailed Mr. Evans indicating that he was going to be in the area and would like to come by and see the Flag.

39.     Even though Mr. Evans did not respond, Mr. Vitale and his fiancée, Kate Mello, stopped by NPS that day.

40.     Mr. Vitale discovered that NPS was no longer displaying the Flag.

41.     An NPS attendant on duty, Ken, informed Mr. Vitale that NPS had "cycled out" the Flag a few weeks prior per NPS' standard practice.

42.     Mr. Vitale asked Ken to see the Flag to make sure everything was OK, and Ken assured him that the Flag was safe in the "archives" and that Mr. Evans would have reached out if there were any issues.

43.     Ken also assured Mr. Vitale that Mr. Evans would let Mr. Vitale know when NPS put the Flag back up on display.

44.     During this interchange, Mr. Vitale pointed out a heavily faded George Bush autograph in a case and commented on the fading.

45.     Ken responded, "I know, I've been telling them for years that they need to switch out the lighting and glass.  It is not the right stuff for this type of display."

46.     On January 31, 2022, Mr. Vitale emailed Mr. Evans asking if NPS had redisplayed the Flag.

47.     Given that prices of Tom Brady memorabilia had skyrocketed due to the potential for Brady's retirement, Mr. Vitale was considering bringing the Flag to auction.

48.     Goldin Auctions, the premier sports memorabilia auctioneer, wanted to feature the Flag as the cover item in their Winter Elite auction and create a video and other exclusive marketing materials related to the Flag.

49.     Mr. Evans responded the next day.  After apologizing for his delayed response, Mr. Evans informed Mr. Vitale, for the first time, that there had been some "slight fading" to the autograph during the 67 days NPS displayed the Flag from June 25, 2021 to August 31, 2021.

50.     Mr. Evans indicated that NPS pulled the Flag from the display because there was an issue with fading.

51.     This additional disclosure was contrary to the false assurances given by Ken in November when Mr. Vitale visited NPS.

52.     Mr. Evans went on to state that the fading of the signature "was not at all due to lighting or the glass since they both are museum-quality and protective. Simply exposing it to air seems to have caused this blue sharpie to fade."

53.     Mr. Vitale immediately went to NPS and demanded to see the Flag.

54.     Mr. Evans came out with the Flag and apologized profusely for the fading and for not notifying Mr. Vitale back in August 2021.

55.     Mr. Evans admitted that he did not photograph the Flag the day he removed it from the display, so Mr. Vitale had no way of knowing whether additional damage was caused to the Flag in the 5 months between when NPS removed the Flag from the display case and when NPS finally told Mr. Vitale that the autograph had faded.

56.     Mr. Vitale then spoke with Jim Scollins, whom he understood to be the Senior Director of Retail Operations and in charge of the Patriots Hall of Fame operations.

57.     Mr. Scollins told Mr. Vitale that, contrary to Mr. Evans' representations, and the public representations NPS makes regarding is status as a museum with curator, NPS was not, in fact, a museum.

58.     Moreover, as it turns out, contrary to NPS' earlier representations, neither Mr. Scollins, Mr. Evans nor anyone employed by NPS, had any background or expertise in memorabilia preservation, museum standards, or the like.

59.     Mr. Scollins further informed Mr. Vitale that he to Google "preservation methods" and "museum standards" in response to Mr. Vitale's complaints to claim that NPS

"did everything right," despite admitting that daylight and air can cause issues with autographs.

60.     Mr. Scollins also told Mr. Vitale that this was the first time that this has ever happened at NPS.

61.     This representation, too, was patently false.

62.     Just six months prior to accepting the Flag on loan, NPS had an incident in which the signature on loaned memorabilia faded.

63.     Had NPS been truthful with Mr. Vitale in its representations and disclosed this previous incident, Mr. Vitale never would have entrusted the Flag to NPS' care.

64.     The damage to the Flag caused by NPS' misrepresentations, gross negligence and breach of the Agreement is irreparable.

65.     The loss in value to the Flag due to NPS's misrepresentations, gross negligence and breach of the Agreement is significant, ranging from several hundred thousand dollars to well over one million dollars.

66.     On May 10, 2022, Mr. Vitale permitted NPS and its expert to inspect the Flag.

67.     Mr. Vitale, through counsel, issued a demand letter to NPS pursuant to M.G.L. ch. 93A on June 17, 2022.

68.     NPS, through counsel, responded to the 93A demand letter on July 14, 2022, but failed, neglected or otherwise refused to make a reasonable settlement offer.

Count I
Fraudulent Misrepresentation

29.     The allegations contained in paragraphs 1 through XX of this Complaint are incorporated as if fully set forth herein.

30.     NPS intentionally misrepresented its ability to care for and protect an invaluable piece of Patriots' history that Mr. Vitale entrusted to their care.

31.     NPS held itself out to the public as a "museum" on www.patriotshalloffame.com  and Mr. Evans as its "curator."

32.     NPS' representation was knowingly false.

33.     Between May 12, 2021 and May 19, 2021, Mr. Evans assured Mr. Vitale that NPS was a "museum" and that NPS would curate the Flag "to the highest standard."

34.     NPS's representation was knowingly false.

35.     Between May 12, 2021 and May 19, 2021, Mr. Evans assured Mr. Vitale that he would have access to the Flag when requested and that NPS "would do whatever was needed to preserve it."

36.     NPS' representation was knowingly false.

37.     NPS represented in paragraph 1 to Schedule 1 of the Agreement that it would exhibit the Flag "using accepted professional library and museum techniques and standards."

38.     NPS's representation was knowingly false.

39.     NPS' agent, Mr. Scollins, subsequently admitted that NPS is not a museum.

40.     NPS's agent, Ken, admitted that the glass and lighting were not appropriate for the artifacts being displayed.

41.     Prior to Mr. Vitale entrusting the Flag to NPS, Ken repeatedly put NPS on notice of this vital shortcoming.

42.     NPS was aware that autographed memorabilia under its care could suffer fading due to the lighting and cases used at NPS but fraudulently assured Mr. Vitale that NPS would preserve the Flag in its original condition while in their possession.

43.     Mr. Vitale relied on NPS' fraudulent and intentional misrepresentations to his detriment by signing the Agreement, declining insurance coverage and ultimately entrusting the Flag to NPS's care.

44.     NPS's fraudulent and intentional misrepresentations are the direct and proximate cause of damages to Mr. Vitale, entitling Mr. Vitale to damages within the jurisdictional limit of this Court.

Count II
Negligent Misrepresentation

45.     The allegations contained in paragraphs 1 through XX of this Complaint are incorporated as if fully set forth herein.

46.     NPS negligently misrepresented its ability to care for and protect an invaluable piece of Patriots' history that Mr. Vitale entrusted to their care.

47.     NPS held itself out to the public as a "museum" on www.patriotshalloffame.com  and Mr. Evans as its "curator."

48.     NPS knew or should have known that this representation was false.

49.     Between May 12, 2021 and May 19, 2021, Mr. Evans assured Mr. Vitale that NPS was a "museum" and that NPS would curate the Flag "to the highest standard."

50.     NPS knew or should have known that this representation was false.

51.     Between May 12, 2021 and May 19, 2021, Mr. Evans assured Mr. Vitale that he would have access to the Flag when requested and that NPS "would do whatever was needed to preserve it."

52.     NPS knew or should have known that this representation was false.

53.     NPS represented in paragraph 1 to Schedule 1 of the Agreement that it would exhibit the Flag "using accepted professional library and museum techniques and standards."

54.     NPS knew or should have known that this representation was false.

55.     NPS' agent, Mr. Scollins, subsequently admitted that NPS is not a museum.

56.     NPS's agent, Ken, admitted that the glass and lighting were not appropriate for the artifacts being displayed.

57.     Prior to Mr. Vitale entrusting the Flag to NPS, Ken repeatedly put NPS on notice of this vital shortcoming.

58.     NPS was aware that autographed memorabilia under its care could suffer fading due to the lighting and cases used at NPS but failed to use reasonable and ordinary care in giving assurances to Mr. Vitale that NPS would preserve the Flag in its original condition while in their possession.

59.     It was foreseeable to NPS that Mr. Vitale would rely on the representations NPS made about its ability to care for and preserve the Flag while in NPS' care.

60.     Mr. Vitale relied on NPS' misrepresentations to his detriment by signing the Agreement, declining insurance coverage and ultimately entrusting the Flag to NPS's care.

61.     NPS's misrepresentations are the direct and proximate cause of damages to Mr. Vitale, entitling Mr. Vitale to damages within the jurisdictional limit of this Court.

<u>Count III</u>
<u>Breach of Contract</u>

47.     The allegations contained in paragraphs I through XX in this Complaint are incorporated as fully set forth herein.

48.     Paragraph 1 to Schedule 1 of the Agreement required NPS to exhibit the Flag "using accepted professional library and museum techniques and standards."

49.     NPS breached this provision of the Agreement.

50.     NPS acknowledged that it had neither the personnel, equipment or know-how to meets its contractual obligation to use "accepted professional library and museum techniques and standards."

51.     Paragraph 20 of the Agreement requires that NPS to determine if an item is too fragile for display.

52.     NPS' agent, Mr. Scollins, admitted that he was aware that daylight and air can cause issues with autograph fading.

53.     NPS, who held themselves out as the experts, never disclosed this information or raised this gap in its knowledge and ability as an issue.

54.     If simply exposing blue sharpie to light is enough to make it fade, then it was incumbent on NPS to either decline to take the Flag on loan or to ensure that they could display the Flag in such a way that it was not exposed to daylight and air or any other factors, environmental or otherwise, that may impact the quality of the artifact, including any autographs thereto.

55.     Instead, NPS accepted the Flag and failed to ensure that it was protected in breach of Paragraph 20 of the Agreement.

56.     Paragraph 18 of the Schedule to the Agreement required NPS, in the event of harm or loss of the Flag, to notify Mr. Vitale as soon as reasonably practicable.

57.     NPS breached Paragraph 18 of the Agreement by failing to notify Mr. Vitale of the harm to the Flag in August of 2021 when it recognized the fading, removed it from the display and placed it in "archive."

58.     Instead, NPS said nothing for 5 months until February 2022 when Mr. Vitale requested to pick up the Flag.

59.     NPS only informed Mr. Vitale of the fading after its discovery became inevitable.

60.     NPS' intentional and calculated failure to notify Mr. Vitale of the damage to the Flag is a knowing and flagrant breach of the Agreement.

61.    NPS' various breaches of the Agreement are the actual and proximate cause of damages to Mr. Vitale, entitling Mr. Vitale to damages within the jurisdictional limits of this Court.

Count IV
Violation of M.G.L.c.93A

61.    The allegations contained in paragraphs 1 through XX in this Complaint are incorporated as fully set forth herein.

62.    NPS was engaged in trade or commerce in Massachusetts at all times relevant to this dispute.

63.    NPS' conduct constitutes unfair and deceptive acts and trade practices in violation of Chapter 93A, Section 2.

62.    NPS' unfair and deceptive acts and practices include, but are not limited to misrepresenting itself to Mr. Vitale and the public as a "museum" and Mr. Evans, its agent, as a "curator," misrepresenting its ability to use "accepted professional library and museum techniques and standards" in caring for loaned artifacts, knowingly inducing Mr. Vitale to sign the Agreement, forego insurance and entrust the Flag to NPS by falsely claiming that it was a museum with a curator and that the glass and lighting at NPS were appropriate for the artifacts being displayed, failing to notify Mr. Vitale of risks, known to NPS, of autographs fading while on display, and failing to notify Mr. Vitale when it discovered that the Tom Brady autograph on the Flag had faded significantly.

69.    NPS further violated M.G.L.c.93A by failing, neglecting or otherwise refusing to make a reasonable settlement offer in response to Mr. Vitale's demand.

64.    NPS' violations of M.G.L.c.93A were done willingly and knowingly so as to entitle Mr. Vitale to an award of treble damages as well as reasonable attorneys' fees, costs and expenses.

65.

**Jury Demand**

Plaintiff Daniel Vitale demands a trial by jury on all issues triable in this action.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Daniel Vitale, respectfully requests that this Court:

A.  Award Mr. Vitale his actual damages, interest and costs as a result of NPS's fraudulent misrepresentation;

B.  Award Mr. Vitale his actual damages, interest and costs as a result of NPS's negligent misrepresentation;

C.  Award Mr. Vitale his actual damages, interest and costs as a result of NPS's breach of contract;

D.  Award Mr. Vitale treble damages, attorneys fees, costs and as a result of NPS' willful violation M.G.L.c.93A; and

E.  Grant such other and further relief as may be necessary and just.

Respectfully submitted,

**DANIEL VITALE**

By his attorneys,

SHEEHAN PHINNEY BASS & GREEN PA

October 5, 2022

*/s/ Michael J. Lambert*
Michael J. Lambert (*BBO 632053*)
Sheehan Phinney Bass & Green, PA
28 State Street, 22nd Floor
Boston, MA 02109
(617) 897-5600
mlambert@sheehan.com